U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

*/s/ Harlin DeWayne Hale*

**United States Bankruptcy Judge**

**Signed April 03, 2012**

---

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| HERITAGE CONSOLIDATED, LLC, and | § | Case No. 10-36484 HDH-11 |
| HERITAGE STANDARD CORPORATION, | § | Case No. 10-36485 HDH-11 |
| | § | |
| Debtors. | § | Jointly Administered Under |
| | § | Case No. 10-36484 HDH-11 |

| | | |
|---|---|---|
| HERITAGE STANDARD CORP., | § | |
| PAT HOWELL, LLC, and HERITAGE | § | |
| CONSOLIDATED, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Adversary No. 10-3417 |
| | § | |
| APOLLO PERFORATORS, INC., | § | |
| | § | |
| Defendant. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The parties entered into a joint pre-trial order with stipulated facts and law, which was entered by the Court on February 14, 2012, these are hereby adopted and incorporated herein. The Court held a trial on the complaint and upon conclusion of the presentation of testimony and

evidence, took the matter under advisement. After consideration, the Court makes the following Findings of Fact and Conclusions of Law:

## I. FINDINGS OF FACT

**A.** **Introduction**

1. In August 2009, Heritage Standard began operations on a natural gas well in Winkler County, Texas known as the Pat Howell Well #1 ("Well").

2. The Well is located in the Cheyenne Field, which has proven reserves of natural gas in the Atoka formation.

3. Heritage Standard's operation was to re-enter the existing wellbore for the Well and then complete operations to the Atoka formation.

4. In January 2010, after four unsuccessful and expensive attempts, Heritage Standard successfully completed the Well.

5. On January 19, 2010, however, Apollo Perforators, Inc. ("Apollo") dropped 30,000 feet of steel wireline into the well-bore, resulting in the complete loss of the Well. According to Mr. Lee, President of Apollo, the event was a "catastrophe."

6. Heritage Standard proved, by a preponderance of the evidence, that it suffered damages in the amount of $6,461,298, which represents the sum of repair costs prior to May 9, 2010, of $5,711,048, plus the most conservative, credible estimate to recomplete, of $750,250.

**B.** **Parties**

7. Heritage Standard, a debtor in the above captioned matter and a plaintiff herein, is a Texas corporation with its principal place of business in Dallas County, Texas. Heritage Standard is the operator of the Well.

8. Heritage Consolidated, a debtor in the above captioned matter and a plaintiff herein, is a Texas entity with its principal place of business in Dallas County, Texas. Heritage Consolidated owns an 81.25 percent working interest in the Well and was joined in this action with Apollo's express agreement.

9. Pat Howell, a party in the above captioned matter and a plaintiff herein, is a Texas entity with its principal place of business in Dallas County, Texas. Pat Howell owns an 18.75 percent working interest in the Well and was joined in this action with Apollo's express agreement.

10. Apollo, the defendant herein, is a Texas corporation with its principal place of business in Ector County, Texas.

**C.    Procedural Background**

11. On May 3, 2010, Heritage Standard, individually and as assignee of all working interests, filed suit against Apollo, in a Texas state court, for negligence and gross negligence. The state court action was originally styled *Heritage Standard Corp. v. Apollo Perforators, Inc.*, Cause Number 15,831, 109th Judicial District Court, Winkler County, Texas.

12. Due, in large part, to the loss of the Well caused by Apollo, Heritage Standard filed the instant bankruptcy action on September 14, 2010. Apollo filed proofs of claims on October 13, 2010 (Claim No. 21-1) and October 20, 2010 (Claim No. 29-1).

13. On December 8, 2010, Heritage Standard filed its *Notice of Removal* ("Removal") of the Apollo lawsuit.

14. Apollo did not file a statement pursuant to Fed. R. Bankr. P. 9027(e)(3) within fourteen days after the filing of the notice of removal, *i.e.*, by December 22, 2010.

15. After the Rule 9027(e)(3) deadline passed, the Court conducted the January 11, 2011 *Status Conference on Notice of Removal*. The Court was informed that there was no remand-motion and that Apollo had "no issues with working out a scheduling order," and Apollo expressly consented in a motion and in an agreed order to trial before this Court: "**TRIAL** is set before the **Honorable Harlin DeWayne Hale at 1100 Commerce Street, 14th Floor, Dallas, Texas 75242** the week of February 6, 2012."

16. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b), and venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**D.    Factual Background**

17. Plaintiffs own oil and gas properties in the Cheyenne Field, and, in 2008, began applying new drilling technologies to produce the field.

18. Apollo was hired to place a production packer—an expandable plug-like device for sealing off the annular space between the Well's tubing and the casing—in the 7-inch liner. In preparation for lowering the packer into the Well, Apollo lowered a gauge ring, a cylindrical metal ring used to guide and centralize packers or tools inside casing. The gauge ring stopped at a depth that was higher than Heritage Standard had originally planned, and Apollo removed the gauge ring from the Well. After Heritage Standard confirmed that the gauge ring had stopped at a sufficient depth and within the 7-inch liner, Apollo lowered the packer into the Well.

19. Apollo lowered the packer into the 7-inch liner, and it stopped at approximately the same depth as the gauge ring, *i.e.*, within the 7-inch liner. However, Apollo could neither set the packer (*i.e.*, cause it to expand and permanently implant) nor disengage its wireline from the packer. Apollo's wireline was manually cut from the

packer. After being cut free, the Apollo operator, Daniel Creek, began to reel in the wireline from the well-bore. After reeling in approximately 2,000 feet of wireline, Mr. Creek unsuccessfully attempted to shift from first to second gear, and all 30,000 feet of wireline unspooled into the Well at high velocity. (Test. of Gregg Vickrey).

20. Immediately after the wireline drop, Apollo's truck was returned to its manufacturer, Synergy Industries, LP, for repairs. There it was determined that the wireline braking system was in disrepair, and the pictures taken shortly after the incident at the Well support this finding. In addition, the testimony of William Raymond Valentine, Jr., the representative of Synergy Industries, confirms this finding. The condition of the braking system at the time of the incident was the primary cause of the accident.

21. After an extended fishing operation to retrieve the wireline from the Well, water was encountered in the well-bore at a depth of approximately 7,100-7,500 feet (over 7,000 feet above the Atoka formation). Previously closed perforations at Brushy Canyon (approximately 7,500) and Bone Springs (approximately 9,000) were successfully tested prior to the wireline drop, and, according to a preponderance of the evidence, were only compromised after, and as a result of, the Apollo wireline drop and fishing operation. The preponderance of the evidence shows that Apollo's wireline drop and the retrieval of the wireline resulted in water entering the Atoka completion and the complete loss of the Well. The preponderance of the evidence suggests that the water in the Well did not come from the Atoka formation, as such would be physically impossible. (Test. of Dr. Rasty).

22. Heritage Standard subsequently incurred $5,711,048 in out-of-pocket costs by May 9, 2010, re-completing the Well, and the most conservative, credible estimate for re-completion was $750,250.

E. **Credibility of the Witnesses**

23. The Court has found liability based on, *inter alia*, the credible testimony of Dr. Rasty. It is also clear from the record, as a whole, that the Well was operating fine before Apollo came along, and, after the wireline drop and retrieval, it was destroyed and in need of substantial repair.

24. The findings and conclusions on damages are supported by the credible testimony of Messrs. Wisenbaker, Bufkin, and Pinssonault, Ms. Clements, and Dr. Rasty. After trial, this Court personally reviewed the charges incurred for repairs on the Well during the period January 20, 2010 to May 9, 2010. The testimony offered by the Plaintiffs supports a finding and conclusion by the Court that such charges are actual and necessary. The undersigned cut off the damage claims on May 9, 2010, primarily because of the testimony of Debtors' own witness, Gary Todd. While the Court understands Mr. Bufkin's subsequent testimony and "baseball game analogy" for expenses after that date, in cross-examination, Mr. Todd, was fairly certain on the propriety of a May 9 cut off date. Accordingly, this Court adopts that date as the appropriate stopping point for charges.

25. The Court has not awarded delay damages based on the testimony of Dr. Caldwell. Dr. Caldwell was knowledgeable. However, in this specific instance, his testimony was not given weight as the cross-examination and evidence offered by the Defendants pointed out too many questions concerning his calculations.

## II. CONCLUSIONS OF LAW

**A.  Liability**

1. Apollo failed in multiple acts and omissions to use ordinary care in maintaining and operating its wireline equipment, proximately causing the unspooling of the wireline into the Well at high velocity and the retrieval of such wireline from the Well, and resulting in the damages for which Plaintiffs sue.  The Well was damaged by Apollo either during the drop or when the wireline was retrieved from the Well.

2. Apollo's acts and omissions, which were failures to use ordinary care, included –

    a. Failing to properly train and supervise personnel operating Apollo's equipment;

    b. Failing to properly maintain the equipment;

    c. Failing to properly shift gears;

    d. Failing to properly apply brakes; and

    e. Improper retrieval of the wireline for the Well.

    Such acts and omissions proximately caused the injury and resulted in the damages for which Plaintiffs sue.

3. The testimony of Dr. Rasty, giving little weight to the von Mises equation testimony, supports a finding of fact that Apollo caused the damage to the Well, either in the drop or the retrieval.

4. Apollo did not show, by credible evidence, that the other parties are responsible.

**B.    Actual Damages**

5. Apollo owes Plaintiffs $6,461,298 in actual damages.

6. Plaintiffs shall also receive from Apollo their costs of court and pre- and post-judgment interest at the highest rates permitted by law.

7. Within ten days, counsel for Plaintiffs shall submit a judgment consistent with these findings and conclusions.

**###END OF FINDINGS AND CONCLUSIONS###**
